May it please the Court, my name is Avantika Shastri and I'm appearing on behalf of Petitioner Mr. Tarlochan Singh in this case, with my colleagues Amalia Will and Zachary Nightingale and Mark Vanderhout. Mr. Singh is present today with his wife, Patty, here in the audience. I'd like to reserve five minutes for rebuttal. As you're aware, this case involves two agency decisions on appeal. The Court should reverse and remand both decisions. I'd like to briefly start with the denial of Mr. Singh's motion to reopen, first because the law is clear on this issue. The BIA erred in denying the motion for lack of jurisdiction. Its conclusion directly contradicts the Supreme Court in Dada and Kuchana, this circuit in Kalilu, Reyes and Coit, Reyes-Torres and Coit, and nine other circuit courts that have all held that the Board has jurisdiction over statutory and timely motions to reopen and must exercise that jurisdiction. Well, I don't understand the Board's, what is it, URI decision? What is it, URI? Yes, Your Honor. To say that it doesn't have jurisdiction over the question whether to reopen. It has, it's saying it doesn't have jurisdiction over the question of whether to grant the adjustment of status under these circumstances, and therefore, it won't exercise its discretion to reopen. Isn't that what it's saying? I hear it as saying that it doesn't have jurisdiction to even reopen it or even consider it on the merits because of the merits. So you're arguing that it does have jurisdiction to consider it on the merits or it does have jurisdiction to reopen it while you see USCIS considers it on the merits? The latter, Your Honor, that it has jurisdiction to reopen while seeking. So there's no dispute that, I mean, jurisdiction is a funny word anyway when you're dealing with agency decisions, but there's no dispute that the merits decision as to the adjustment of status is before USCIS, not before the Board, right? Right. And the Board's not saying, as I understand it, that it doesn't have jurisdiction to reopen under those circumstances. It couldn't. It's saying we won't. We are exercising our discretion, but in a blanket way to say that when we're not adjudicating a motion, we're not going to grant a reopening which is functionally a stay. Is that not what it's saying? My understanding is taking this at the step one of Chevron, where it's saying that we don't even have jurisdiction. Well, they don't. Did they say jurisdiction? They say specifically we have not been granted authority. Right. So it would only be granted authority. So that would assume that they've at least concluded that they don't exercise discretion because they don't have authority to do it. Well, we have interpreted it as statutory authority under 8 U.S.C. 1229AC7. So, but in any event, it appears that they've taken the position that they won't exercise their discretion. Is that your point? Yes. Okay. So was there or is there pending before CIS or DHS? Is there pending an effort to stay and get the stay of the removal order from DHS? You mean currently in this case? Yes. No, Your Honor, because the DHS hasn't moved to remove the Petitioner while this Ninth Circuit case is pending. And his ---- Okay. So the question is, the rationale of the Board is, and I think I haven't researched the history, but originally all of the authority over removals and adjudications and the like was consolidated in the Department of Justice, correct? Yes, Your Honor. And then when the division occurred and the DHS then became the agency that has the prosecutorial discretion, DOJ then became, in effect, counsel for the DHS in the legal proceedings, but it's a client relationship. So as I understand it, the Board is saying we can adjudicate whether he should and issue the order for removal, but it's DHS that has the ultimate authority to step in and stay that if there are reasons that would affect the execution of the order. So is it clear that DHS does have that authority to issue an order of staying removal? They have simultaneously. They have that authority at the same time as the Board has authority to reopen the case, and by reopening, the final order is removed altogether until an adjudication is made on the pending adjustment. Well, ACFR 1003.2 says, Did the agency, in its opinion, deal with that sentence? They didn't. And we believe that's an error under this Court's decision of iteriberea, where this Court has found that the agency cannot just simply recharacterize evidence filed under one regulation as another. In that case, the petitioner filed a claim of ineffective assistance as a motion to reopen, and the agency adjudicated it as a motion to reconsider. In this case, I believe the agencies made the same mistake, where he properly filed a timely statutory motion to reopen with new evidence, including an approved I-130, and showing that he was prima facie eligible for adjustment, and the Board erred by characterizing that as a request for a stay rather than as a motion to reopen. But ultimately, then, I mean, a lot turns on whether they claim to be exercising discretion or saying we can't do it, we're not allowed to do it. At some points, they seem to be saying we're not allowed to do it. Right. And if they're not allowed to do it as a statutory matter, then that's incorrect. You mean if that's the position they're taking? Yes. Because it is a little hard to understand what they're really saying there. Right. But to the extent that jurisdiction is a question of, at step one, of whether or not the statute is clear, whether or not the Board has jurisdiction to do it, then we would argue it is a jurisdiction error of law. Well, I'm just looking at their opinion. They say separately, apart from any question of jurisdiction, after they said they have no authority. So I agree. It's a little, whether it's jurisdiction or authority, it still boils down to the fact that they, as a blanket matter, won't exercise discretion. And then the rationale, their rationale is that the authority lies with DHS. So there's, it's not that the petitioner has no remedy. They just have to come, go to the correct agency, which would be DHS in this case. Well, I have two responses to that, to your comment. And one is, is that in the matter of Yowie itself, the Board notes that this is not a timely motion to reopen, whereas the Ninth Circuit had considered timely motions to reopen in Kalilu and found to the contrary. And two, still, even though DHS does have authority to review stays, that in itself may raise suspension clause issues, because if the DHS were to deny a stay based on this kind of evidence, then under ATUSC 1252G, it's arguable whether any court has jurisdiction to review that decision. Whereas if the Board at least has jurisdiction to review a motion to reopen, then this Court has jurisdiction to review that. And so you can avoid the constitutional issue. Right. Okay. So for these reasons, we believe that his motion to reopen should be remanded for reconsideration on its merits, and the Board can decide then whether to grant or deny. We also would like this Court to consider the merits of Mr. Singh's asylum appeal. In this case, the Board incorporated the IJ's decision and also added its own reasoning. The IJ found his testimony consistent on the merits, but the Board relied on three alleged inconsistencies on the merits for its adverse credibility finding. I'd like to address these three erroneous findings. Most significantly, the Board erred as a matter of law in dismissing his corroborating evidence. On page three of their decision, they have a paragraph with their reasoning and denying on the merits. And they say that they dismissed his father's two affidavits as inconsistent and implausible, without any further discussion. However, a review of the two affidavits, the first is on page 1095, and the second is on page 898, show that they are not inconsistent. The second is merely an elaboration of points raised in the first, and in no way is precluded by any of the statements in the first. Therefore, the Board's conclusion is factually inaccurate and legally incorrect under the circuit's precedent in Akinmati, Singh V. Gonzalez, and Chawla, all of which have been cited in the briefing, which have found that the differences in the level of detail between the two documents is not a basis to dismiss the evidence as incredible. Notably, because this conclusion is critical to the Board's decision, we believe that the Court can reverse and remand the case on this basis alone, because under Chenery, the Court cannot assume the Board would have come to the same conclusion if its review of the evidence were different. I'd like to reserve my time at this point for rebuttal, but would be happy to answer any other questions on the merits of this case. Good morning, Your Honors. Again, Blair O'Connor on behalf of the Attorney General. Initially, with respect to the motion to reopen issue, again, I apologize for the late notice, but I came into these cases very late in the game. I did learn from my clients two days ago that the adjustment of status application was adjudicated by DHS in March of this year and was denied. And since that was the whole basis for the motion to reopen before the Court of Appeals Now, this is really ridiculous, frankly, I mean, since we've spent a great deal of time trying to understand this all. And I say that to both sides. Again, I apologize, Your Honor. I will take that back to my office and surely inform my director that the Court wishes, you know, the government to learn this type of information and provide it to the Court ahead of time. Again, I do apologize. That wouldn't be new information. The way you phrased it. That's not new information to your directors at DOJ. Oh, I understand, Your Honor. They should darn well know it. I know. And if their assignment of counsel is last minute, there's in the meanwhile somebody responsible for the case. I understand, Your Honor. The Attorney initially assigned to argue this case recently got a job. But if I may, I'd like to ask the opposing side as well. Is this right? And why did you stand up here and argue for 15 minutes? It's not correct, Your Honor, because the adjustment. When you file the adjustment, you require a fraud waiver injunction. I'm sorry? We're not getting any of this. So maybe could you step to a microphone? At least I'm not. The echoing in this room is really challenging. My apologies, Your Honor. It's not accurate in the sense that, yes, the adjustment was denied. However, the adjustment was filed with a fraud waiver at the local office. And the local office has denied both the adjustment and the fraud waiver. However, there's a motion to reconsider pending on the adjustment. And there's also an appeal pending of the fraud waiver. So these issues remain live. And this Court has found in Ahmed v. Holder that a person has a right to file an appeal of an I-140 visa petition, and that, therefore, the case remains. The issue of whether to grant a motion to continuance for a pending adjustment remains valid. Well, you might have told us also. I apologize. Since it was pending, I didn't think it was necessary to clarify right away. And you might have given us the whole story this time as well. Because denied means, to me, denied, not still alive. Yes, Your Honor. Yes, Your Honor. So let's assume that it is sufficiently still alive that it is worth arguing the issue. Okay, Your Honor. Then I would note that the Board was correct in relying on this precedential decision in minor viare that because this is an alien under a final order of exclusion, only DHS has jurisdiction to adjudicate the adjustment application. Well, how can that be? I just read before a sentence, the sentence that says that they can reopen anything, any time. Oh, sure. But I'm just talking about the jurisdiction over the adjustment application itself. Oh, that's right. But their opinion seems to say that they don't have authority. Where are they getting that from, to reopen? I think their opinion says, Your Honor, that they're not going to exercise the discretion to reopen. No, that's not what it says, actually. And you should read it, or you should have read it. It says, as to the main issue, that there's no authority. Then it says that also, because this is untimely, we wouldn't do it as a matter of discretion. But they do use the word authority, which, to me, means we can't. And, in fact, the statute says specifically that they can reopen anything. I agree, Your Honor. And to the extent that the Board has seen you So they're wrong. They're just wrong. I would agree that they have the authority to sui sponte reopen in any case, yes, by all means. Or not sui sponte. This was a timely motion. To timely reopen the case. But they said specifically otherwise. So isn't that the end of the story? I think they're correct to characterize motions of this nature as essentially a request to stay proceedings while the application is pending. Why? Because, again, the EOR has no authority over the application. They have no jurisdiction over the application. They can't adjudicate it. Only DHS can adjudicate it. This is an alien under a final order of exclusion. He's under a final order of exclusion. He's asking the Board to reopen that final order that's been final for years, basically to sit on the case to wait on it until DHS completes review of the adjustment application. And the Board is correct in saying that he can make that request with DHS. They're the adjudicator. They're the authority that can adjudicate that application. They have the power to grant a stay while the application is pending. So the Court is extremely busy, as this Court is extremely busy. There's thousands of cases on its dockets. Why should it reopen hundreds of new cases of this matter when they are not the adjudicator of the application that the movement wants the case reopened? So now you're arguing they were correct to not exercise their discretion. Yes, Your Honor. Yes, Your Honor. So I would say that, again, given that the Board has considerable discretion over motions to reopen, they did not abuse that considerable discretion. But this is what their conclusion was. We conclude that we have not been granted authority to reopen the proceedings of Respondents who are under a final administrative order to pursue matters that could affect their movability if we have no jurisdiction over such matters. That's just wrong, as well as inconsistent with our case law. And that's the problem we have. They say both things. So how should we reconcile that? I would say it's harmless error, Your Honor, again. It's harmless error. Even if they have, assuming they have the authority, they have the authority to reopen, it's in their considerable discretion to not exercise that authority.  Excuse me. Excuse me. Can I clarify something? Because matter of URI, which both of us have been reading from, says it uses authority. But in this decision, they say the following. And I'm pursuing this because you seem to be providing the explanation that may address our concerns. As we explained in our recent decision, matter of URI, we have long been of the view that administratively, final exclusion, deportation, or removal proceedings should not be reopened for matters over which neither the immigration judge nor the board has jurisdiction. So you're saying, okay, they have the authority to reopen, but if the relief that they have, as a matter of their institutional discretion, reopen because the jurisdiction to grant relief is with DHS, and DHS is in a position not only to make the ultimate decision, but also to grant a stay while they are considering that relief. Is that your position? That is exactly what I'm saying, Your Honor. And again, as you noted, nothing has prevented the alien from going to DHS and asking for a stay, but they've decided not to do so because, again, DHS is not actively seeking to execute the removal order while the case is pending before the Ninth Circuit. So at the end of the day, again, the issue is really moot because he's not going anywhere while everything is being adjudicated. But wait a minute. That's not true either because if we decide this case tomorrow, then he could go somewhere. Yes, Your Honor. While the other proceeding is pending. Yes, Your Honor. But he could request a stay. Then he could affirmatively request a stay from DHS while his appeal of the adjustment denial is pending. And then, of course, there's the minor fact that we have an opinion on this issue in this Court. And what about that? I mean, I understand that the agency can — we owe deference to the agency, but the decision, what seemed to me to be a decision as a matter of law, that, in fact, the agency does have this authority. Again, Your Honor, I understand, you know, the concern. I think in matter of the RA, the Board did address this Court's decision and noted that it had been told we need an explanation as to whether or not you can reopen. And it, again, although it's very unartfully worded, I think that everyone agrees that the Board, yeah, it can reopen. It can reopen any case, especially one where a motion is timely and it's been presented to it. It is decided as a matter of discretion, though, that when the underlying relief sought doesn't lie with the Board. It lies with the agency. Then that request is one that should be made to the agency, to the adjudicator, asking it, look, halt removal until my appeal or the adjustment denial is final. And that is reasonable. We think that is entirely reasonable for any adjudicator, whether it be administrative, judicial, anywhere. If you don't have — if you're not the adjudicator of what the ultimate relief is, then you shouldn't be in the game of giving stays. I mean, you should go to the adjudicator and ask for a stay from the adjudicator. And we think that is reasonable. As my time is running out, moving to the adverse credibility determination. Your Honor, as the record in this case fails to compel the conclusion that petitioner presented a credible asylum claim, particularly when he admitted to making multiple false representations in the sworn declaration submitted in support of the motion to reopen to rescind his These misrepresentations, combined with several other material inconsistencies between his asylum hearing testimony and his two sworn asylum statements, provide more than substantial evidence to uphold the adverse credibility determination in this case. Now, although he spends considerable time in the opening brief challenging the airport interview, the government's position is that the adverse credibility determination can be upheld even putting aside the airport interview. In his motion, a sworn declaration submitted in support of the motion to reopen to rescind the inobstantial exclusion order, the petitioner testified that he had no idea where the name that appeared on the charging document came from and that he said affirmatively, I have never used that name. In his testimony before the immigration judge, he did a complete 180. He admitted to definitely using that name with the inspector who interviewed him at JFK Airport. That in itself is a false representation in the declaration in support of his motion to reopen. He also said in the motion to reopen that prior to January of 2006, he never knew that he'd been placed into exclusion proceedings. Now, this flies in the face of the charging document, which told him that he is being placed into exclusion proceedings and gave him the date and time of his exclusion hearing. He admitted that he could read English, contrary to what he said in the declaration in support of the motion to reopen. I have a question about that. How many years later was that statement made where he said he could read English? That was during his testimony, Your Honor, before the asylum hearing. Right. And so how many years later was that? Because the airport interview was... 1994. Many years earlier. But the point is... Is that how to reconcile those statements? They seem to be directly contradictory, but I just noticed there are, you know, a few decades of time in the past in between there. Sure, Your Honor. But his testimony at the hearing is that he could read English when he came to the United States. Was it? Yes. Do you have a record site for that? Yeah. It was that I studied English in college. There are many people who studied English in college and can't read English. Yes. Sort of like the Chinese I studied in college. Sure. But do you have the record site for that, please? Is it just that? Or maybe that's the answer to Judge Berzon's question. That'll do it for me. Did he testify that he had studied it in India? That part I got. I have a record site at AR-307... Okay. ...where he stated that he could read and write English when he arrived in the United States, such that nothing prevented him from reading the charging document that was provided to him at the airport interview. What are you reading from? AR-307. That's his testimony before the immigration judge. Yes, Your Honor. You're reading his testimony or you're reading what somebody said about his testimony? I'm reading what he said, what he told the immigration judge. He said such that? He said that he admitted basically on cross-examination that nothing prevented him from having read the charging document. What page is that? 307, Your Honor, because he admitted that he could read and write. He didn't say he could speak it, but he admitted being able to read and write English when he arrived in the United States. And that also goes to why we say that there's sufficient indicia of reliability with the airport interview. He admitted that he could have read that statement, and he signed each page of that statement. He admitted that was his signature, that he provided a false name, provided a false date of birth. The board cited as particularly relevant his statements of how long he was held in jail and how many times the police came to him. Why is that material? Because it goes to the act of persecution, Your Honor. His claim of past persecution is based on three separate arrests and detentions. And so that's a material issue. I mean, how long was he held by the police on his second arrest? His first asylum statement said he was held for four days. His testimony before the immigration judge said he was only held for four or five hours. That's a pretty big difference, Your Honor. And that's material. In addition to the issue of how many times the police visited him after the third arrest, he said in his first asylum statement there were only two visits. In his second asylum statement, given several years later, he said that there was a visit once or twice a week for about a two-, three-month period. About ten times, I think he said. That was his testimony before the immigration judge, yes. So, again, that's a big difference regarding how interested are the police in him. And all this, of course, contradicts his airport interview where he said that he was never detained by the Indian government and that the Indian government was not looking for him. And obviously that's a complete 180. Was he asked directly about the discrepancy between the point of entry, New York, and Blaine? Yes, Your Honor. He attempted toóI see him right now on time if I may answer the question. He said that he tried to blame that on his first attorney who he admitted he did not file any bar complaints against. And, again, the reason why that's not a credible explanation goes back to the fact that he can read English. He admitted being provided that asylum application that the attorney prepared, and he didn't read it. He admitted he could have, but he just didn't decide to read it before he signed it. Therefore, he should definitely be held accountable for the fact that he gives a complete different place of entry on the West Coast than Blaine Washington versus his actual point of entry in the East Coast. What reason would there be for doing that? We would speculate that he didn't want the client, the agency, to realize that he had been put in exclusion proceedings on the East Coast. That's why he's using a different name and a different date of birth. Yes. I mean, he was assigned a different A number. And also a different date of birth. Yes, Your Honor. He's given three different dates of birth, at the airport interview and at both of his asylum applications. And there are two A numbers. And two different A numbers because of the, you know, false representations made in the initial asylum application filed in California. So we just have a record replete with material inconsistencies, affirmative misrepresentations. He admits lying in the sworn declaration submitted in the motion to reopen to rescind the exclusion order. This case never should have been reopened. I think we have that. Okay. Thank you, Your Honor. Your Honor, before you leave, since we hammered you for the late notice on the DHS, just to clarify for both sides, the way we prepare cases is that we get your materials, which may have been filed a long time ago, about six weeks before a calendar. And we work those heavily before we get up here on the bench. We have the 28-J letter, which was a process which was used in the prior case to notify us of the development of our own rulings. The same thing applies to making sure that the court has the relevant information before it as to a status which may be material to our analysis, not just sprung on us at oral argument, but at a time when we're preparing the case. So the message should be, as a common-sense one, and maybe we need a rule or some publication on it, but it seems common sense, if there's a potentially material development in the record or the circumstances, we need to know about it. And you do us a courtesy and yourselves a favor if you don't require us to spend meaningless time on something that may moot an issue or whatever. And you don't have to adjudicate whether it will moot the case. If it is a likely or an issue, if it's likely, if you think it might, just give it to the clerk of the court so we're up to date. Thank you, Your Honor. We remember our own. If I can add, I mean, here it appears that then when you stood up, you said the visa was denied, and I perhaps didn't let you elaborate, but I took that to mean denied, finally denied. It appears now that that isn't so, and there may be some dispute, I don't know, between the parties as to the significance of what it is you told us. So there's another reason why you might have told it to us, which was to give the other side the reason to understand that you were, I think, taking the position that the issue was not before us anymore, and if so, they should have had a chance to respond. And I don't know whether you're taking that position still to this day. Are you taking that position or not? If there's an appeal pending, my client did not inform me about it. There is an appeal. Well, there's another problem then. Sure, Your Honor. I mean, we do have a member in our office on the Rules Committee, and I'll definitely be taking this up with him. Okay. Because I totally agree. There needs to be, this needs to be fixed. And if you're going to give us information, it should be accurate information. Yes, Your Honor. I apologize, Your Honor. Thank you. Thank you. I just wanted to respond to some of the Court's concerns. I apologize for not updating the Court, because the case remains pending. I assumed that the issues remained the same, so we didn't update the Court as to the current status. I want to affirm that the Court has been asking about the source of the Board's reasoning in matter of Biari. And if the Board hasn't said that it's relying on its discretion, then this Court should assume, based on the language, that it is relying on Congressional, whether the Congress has given it its authority. And that it's clear under the statute that Congress has given it authority to adjudicate motions, timely motions to reopen. And this was this Court's prior holding in Kalilu, which involved timely motions to reopen, whereas matter of Biari was untimely. If this petition is denied, what prevents your client from seeking a stay? That's opposing counsel's point, that you can seek a stay as long as the other appeal is still pending. Certainly. We are permitted to seek a stay from DHS. However, as I mentioned, should that be, and it's based on the pending adjustment. Right. Should that be then denied, we don't have any recourse for judicial review of that decision, even though he has statutory right to file a motion to reopen and a statutory right, as this Court found in Bona, to, as an arriving alien, to apply for adjustment, even if in removal proceedings. Has he requested a stay? No, he hasn't. But so the problem is, and I guess the point, I agree that matter of Biari is a very discretionary decision. Since they're not adjudicating the motion, they're not really in a position to determine whether it has any probability of success. Ordinarily, whether the underlying motion, right, or the underlying adjustment of status request. And it seems that perhaps the real reason you don't want to go ask the agency is because the agency would consider the likelihood of success, particularly at this point, for example. Presumably they would deny a stay because they don't think you have any likelihood of success, because they've denied it. Is that where the tension is here? Well, I mean, the Board can adjudicate the likelihood of success. It does that routinely. The agency, the Board, and the IJs do that routinely already. Well, as to things that are before them. But it is pretty peculiar to start adjudicating the likelihood of success of something that's not pending before you. Well, no. I mean, under matter of Hashmi, matter of Sanchez-Sosa, the Board and the IJs adjudicate the likelihood of success and the prima facie eligibility for petitions that are before CIS already. So they do have the expertise and the ability to just do the prima facie eligibility review. Because those are in removal cases. Is that why? In deportation cases? Why? Well, the Board has looked differently at motions to continue and whether or not those should be granted based on pending. I see. As it explains in part in Yarry, but, I mean, one of our arguments is, is the reasoning is inconsistent then between motions to continue and motions to reopen. The Board also, and I'm not sure this is a good analogy, but maybe it is, I know that they sometimes fault repay for cases where there's been a lack of timeliness in filing a petition for review with us. They sometimes go back and just sort of reopen and reissue their opinion in order to have a timely order to come before us. And in those instances, technically speaking, the case isn't pending before them either. It's pending before us. So it seems somewhat a noun. Has that issue come up? Am I right that that's what they do? Do you know? You don't know. I don't believe they look at the merits of the motion in those cases. Right. But I do agree that it is one where it's not pending. They look at whether they think there's justification for being late, essentially. Right. And I would say also that the Board's decision in Yarry is incorrect because even this Court has found that the Board can't have a policy of blanket denials without individual consideration of the merits of an application, especially when there's a statutory right to apply for forms of relief, such as this Court found in Epus Prado. And then I just want to touch upon some of your concerns about the asylum application. I just want to clarify what the Board would do. The relief it can grant is a stay. That's it. It can't resolve the underlying? No. The relief it grants is reopening the final order and then observing the pending adjudication, and then once that's resolved, hopefully in the respondent's favor, then they can terminate. So it's not simply staying. It's not staying the proceedings. It's eliminating the final order, in which case a stay is no longer necessary, or it's not necessary. So in regards to the merits of the asylum, you asked about the prior misstatements that the Board relied upon in regards to his arrests and in regards to the duration of his arrest. And I wanted to point out that the Board made an error in relying on those alleged discrepancies by saying that and dismissing his explanation that those errors were caused by prior counsel. They said there was no evidence that those errors were caused by prior counsel. However, he did provide evidence as testimony at court, as well as he affirmatively, those were errors made in his first asylum application by prior counsel. Before that application was adjudicated, he filed after many years of it just remaining pending, he finally went to second counsel and said, I'd like to file a second asylum application. As part of that asylum application in the declaration, he explained, he put forward the correct facts on his entry, his birth date, his name, and he explained that prior counsel made errors. And he did all of this before, effectively as a timely retraction, before he was interviewed on either of these applications. So there is, he was trying to correct the record made by prior counsel. And then he testified consistently during his asylum interview and during his subsequent court hearing about the true facts of his application. So the Board, by saying there's no evidence. I suppose the Board or the IJA was entitled to not believe his application to the degree that the errors in the earlier application were in his favor, But particularly, I mean, I find particularly disturbing the differences in name, date of birth, and place of entry, given the fact that there was an abstention exclusion order and that he couldn't have proceeded under his own name with his own birth date and his own place of entry. Well, a lot of the adverse credibility finding on all of these proceedings after he entered arise from some primary errors that were made as part of the airport interview and the agency's analysis of that airport interview. But it is a fact that he was given a piece of paper that said he was supposed to show up at a certain place at a certain time for a hearing. He didn't show up. Instead, he went to California four days later. Well, he admitted on the record that he didn't, one, he didn't remember. And that there was an order of exclusion. Right. But he didn't read those. Which they had found it at the time. He never would have gotten the reopening to begin with. Well, he didn't read that papers, those papers. Counsel, this is an important point. Well, that was an important point. I'm sorry. Yeah. Forgive me for interrupting, but this is an important point for me. So in response to Judge Berzon's question, mine sort of dovetails. When you're saying he didn't read those papers, my understanding from your briefing was that he had taken the position that he couldn't read the papers. And opposing counsel has just given me a citation to a record, which I'll sure go look at, at 307, not just that he had studied English in India, but that he could read and write when he got here. Is that right? He, the testimony about his. Because I, I just, in response to Judge Berzon's question, I'm trying to get to your, is your position he didn't read those papers upon point of entry in New York or he couldn't? It's, it's a, it's a fine distinction. The point is that. It's not really a very fine distinction. Well, the point is that he had, he admitted on the record he had the ability to read and write English when he came to the United States. Okay. He couldn't verbally communicate in English because he wasn't used very much. So. Okay. But he didn't in fact read those papers. He would have had the ability to read them, but he didn't in fact read them. So the judge was wrong in, in analyzing it as, oh, he didn't show up because he must have read those papers, but he's, the record shows that he said he didn't read the papers. Well, why isn't it that he had the responsibility to read the papers? I mean, somebody gives you papers. I mean, also the, the papers also say that they were read to him in Punjabi. Don't they say that? Well, that brings up a different error in regards to whether or not he fully understood the airport inspector's verbal communications with him, either in Punjabi, in Punjabi. But the fact that he didn't read them, even though he had a responsibility to do so, is certainly a serious misjudgment on his part, but it doesn't support  of, of. But he did at some earlier points say it was because he couldn't read English, and then he changed his story and said it was because I just didn't. Isn't that right? Didn't he at one point say I couldn't read them? He does say in his motion to reopen that he was unable to read the papers and didn't read them. And he has admitted that, that, that he didn't in fact read them. So that statement was incorrect in the sense that he was unable to read them. But he did not in fact read them. But he did also explain that he didn't also understand, you know, any verbal communications that were, some verbal communications that were made to him by the airport inspector because he didn't understand the Punjabi spoken by the airport instructor, inspector. Thank you. Thank you. Thank you, counsel. We will, in the case of Charlotte Singh v. Calder is submitted, and we will proceed to the next case. We're now in the United States v. Marcia Acosta.
judges: FISHER, BERZON, CHRISTEN